**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

CAMILLE PANIA; and RASHIYA AL-
NURRIDIN, individually and on behalf of
all others similarly situated,

                Plaintiffs,

    v.

  CRUNCH HOLDINGS, LLC; CRUNCH
  FRANCHISING, LLC; CRUNCH, LLC,

             Defendants.

---------------------------------------------------------------

Case No. 1:24-cv-7127

**FIRST AMENDED CLASS**
**ACTION COMPLAINT &**
**DEMAND FOR JURY**
**TRIAL**

Camille Pania ("Plaintiff Pania") and RaShiya Al-Nurridin ("Plaintiff Al-Nurridin") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, complain and allege as follows pursuant to the investigation of counsel and based upon information and belief, except as to allegations pertaining specifically to themselves or their counsel, which are based on personal knowledge:

## NATURE OF THE ACTION

1.    As the Supreme Court recently explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone." *Barr v. American Ass'n of Political Cons., Inc.*, 591 U.S. 610, 613 (2020).

2.    More than thirty years ago, in response to consumers' outcry over the volume of unwanted prerecorded robocalls they were receiving – a number dwarfed

by comparison to the barrage of such calls consumers receive today – Congress passed the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. (the "TCPA"), which generally proscribes unsolicited robocalls to cell phones and home phones.

3.    Plaintiffs bring this First Amended Class Action Complaint for legal and equitable remedies resulting from the illegal actions of Crunch Holdings, LLC, Crunch Franchising, LLC, and Crunch, LLC (collectively, "Defendants") in making unsolicited prerecorded robocall advertisements to Plaintiffs and numerous other consumers nationwide, in clear violation of the TCPA.

## PARTIES

### I.    Plaintiff Pania

4.    Plaintiff Pania is an individual and a "person" as defined by 47 U.S.C. § 153(39). Plaintiff Pania is, and at all times relevant hereto was, a citizen and resident of Collin County in Plano, Texas.

5.    Plaintiff Pania is the regular user of a cellular telephone assigned the number 469-***-7115 (the "7115 Number")

6.    Plaintiff Pania received at least one unsolicited telephone call containing a prerecorded voice that promoted and advertised the sale of memberships to a Crunch Fitness gym, including on or about October 6, 2023.

7.    Plaintiff Pania has never provided any of the Defendants with her prior express written consent authorizing calls that contain prerecorded voices selling or marketing products or services to her 7115 Number.

## II.    Plaintiff Al-Nurridin

8.    Plaintiff Al-Nurridin is an individual and a "person" as defined by 47 U.S.C. § 153(39). Plaintiff Al-Nurridin is, and at all times relevant hereto was, a citizen and resident of Collin County in Dallas, Texas.

9.    Plaintiff Al-Nurridin is the regular user of a cellular telephone assigned the telephone number 312-***-7336 (the "7336 Number").

10.    Plaintiff Al-Nurridin received at least one unsolicited telephone call containing a prerecorded voice that promoted and advertised the sale of memberships to a Crunch Fitness gym, including on or about October 6, 2023.

11.    Plaintiff Al-Nurridin has never provided any of the Defendants with her prior express written consent authorizing calls that contain prerecorded voices selling or marketing products or services to her 7336 Number.

## III.    Defendant Crunch Holdings, LLC

12.    Defendant Crunch Holdings, LLC is a Delaware limited liability company with a principal place of business at 386 Park Avenue South, Floor 15, New York, NY 10016.

13.     Defendant Crunch Holdings, LLC is a "person" as defined by 47 U.S.C. § 153(39).

### IV.    Defendant Crunch Franchising, LLC

14.     Defendant Crunch Franchising, LLC is a Delaware limited liability company with a principal place of business at 1109 Second Avenue, New York, NY 10022.

15.     Defendant Crunch Franchising, LLC is a "person" as defined by 47 U.S.C. § 153(39).

16.     Defendant Crunch Franchising, LLC is a wholly owned subsidiary of Defendant Crunch Holdings, LLC.

### V.    Defendant Crunch, LLC

17.     Defendant Crunch, LLC is a Delaware limited liability company with a principal place of business at P.O. Box 1918, Old Chelsea Station, New York, NY 10011.

18.     Defendant Crunch, LLC is a "person" as defined by 47 U.S.C. § 153(39).

19.     Defendant Crunch LLC is a wholly owned subsidiary of Defendant Crunch Holdings, LLC.

**JURISDICTION & VENUE**

20.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227.

21.    Personal jurisdiction and venue are proper because Defendants maintain their headquarters and principal places of business in Manhattan, New York which is within this judicial district.

**THE TELEPHONE CONSUMER PROTECTION ACT OF 1991**

22.    To address consumer complaints regarding certain telemarketing practices, Congress enacted the TCPA in 1991.

23.    The TCPA prohibits, *inter alia*, the making of any telephone call to a cellular telephone number using a "prerecorded or artificial voice" absent an emergency purpose or the "prior express consent" of the party called.

24.    The TCPA further provides that prerecorded calls that contain "advertisements" or constitute "telemarketing" require the sender to acquire the recipient's "prior express <u>written</u> consent" before making such calls.

25.    According to findings by the Federal Communication Commission ("FCC"), which is vested with the authority to issue regulations implementing the TCPA, prerecorded marketing calls are prohibited because receiving them is a greater nuisance and more invasive than live solicitation calls, and they can be costly

and inconvenient to receive. *See* FCC Order 20-186.[1] The FCC has also recognized that wireless customers are charged for such incoming calls whether they pay in advance or after the minutes are used.

26. Moreover, the receipt of unsolicited prerecorded marketing calls aggravates and distracts the recipient and intrudes upon the recipient's seclusion.

27. In order to state a cause of action for violation of the TCPA, a plaintiff need only allege facts demonstrating that the defendant "called a number assigned to a cellular telephone service using a[] . . . prerecorded voice." *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012), *aff'd*, 755 F.3d 1265 (11th Cir. 2014).

## **FACTUAL ALLEGATIONS**

28. Defendants are three corporate entities that collectively operate the CRUNCH® brand of health clubs.

29. Defendants are each ultimately owned by a common parent entity, Champion TopCo, L.P., a Delaware limited partnership, which maintains a principal place of business at 386 Park Avenue South, Floor 15, New York, NY 10016.

---

[1] FEDERAL COMMUNICATIONS COMMISSION, *FCC 20-186: Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, at 1 (Dec. 30, 2020), available at https://docs.fcc.gov/public/attachments/FCC-20-186A1.pdf.

30.     Defendants collectively operate more than 450 Crunch locations across the country, some of which are corporate-owned while others are overseen through franchising agreements.[2]

31.     Defendant Crunch Franchising LLC and Crunch, LLC both act as franchisors and grant franchise opportunities for health clubs to be operated by franchisees under the CRUNCH® name, pursuant to common practices, procedures, and guidelines established and maintained by Defendants.

32.     To become a Crunch franchisee, one must first secure financing that totals between $668,000 and $3,488,000.[3]

33.     Defendants maintain oversight and control of all franchisees through a governance model that imposes on all Crunch franchisees a common set of global standards, plans, and guidelines on matters of daily operation, including marketing strategies and campaigns, and provides them with the means (including the technology and vendor relationships) to implement them.

34.     In this way, Defendants tightly and systematically control, govern, and direct, in a uniform manner, the marketing activities of all Crunch franchisees, including the franchisees' telemarketing activities.

---

[2] Crunch Franchising Opportunities, CRUNCH FITNESS, https://www.crunch.com/franchise (last visited Sept. 9, 2024) (hereinafter, cited as "Franchising Website").

[3] *Id.*

35.    In touting the formidability of their marketing apparatus to potential franchisees, Defendants explain how they work with each franchisee to "pair [a] strong brand with tools you can use to reach prospective members in your community."[4]

36.    Defendants' Franchise Disclosure Document states: "The Franchised Business will use the methods and procedures we have developed (our 'System') and includes standards and methods of operation, accounting, marketing, advertising and public relations, designs, know-how and the standards for conducting a Franchised Business."[5]

37.    The Franchise Disclosure Document goes on to state that Defendants' required, "standard[ized]" "System presently includes the Licensed Marks and associated marks, logos and designs; advertising, publicity and other marketing programs . . . ."[6]

38.    The Franchise Disclosure Document further provides:

All advertising that you propose to use must be approved by us before your use of those materials.  We currently require that all advertising

---

[4] Franchise FAQ, CRUNCH FITNESS, https://www.crunch.com/franchise/faq (last visited Sept. 9, 2024).

[5] *See* Franchise Disclosure Document, CRUNCH FRANCHISING, LLC 10 (May 2023), available at https://www.franchimp.com/?page=pdf&f=105562_2023.pdf[1], **https://perma.cc/4234-M6Y3**. (emphasis added) (hereinafter cited as, "Crunch Franchise Doc.").  Upon information and belief, Defendant Crunch LLC uses the same or a substantially similar franchising document.

[6] *Id.* at 11.

materials and assets must be created by Crunch-hosted online tools (Online Ad Builders) or by Crunch's internal creative team. Franchisees may not hire their own advertising agencies, graphic designers, or other creative production suppliers. <u>This includes mobile marketing</u> . . . . Currently, we have supplier and/or agency requirement for local media planning and buying (including but not limited to traditional media, email, SMS, marketing, paid social media, paid search, display advertising and direct mail) . . . .[7]

39.    So uniform are the standards and methods imposed by Defendants that the Franchise Disclosure Document also requires that each franchisee "conduct pre-opening and pre-sale marketing and promotions in your territory in accordance with our pre-opening and pre-sale plan, and you cannot deviate without our prior written approval."[8]

40.    Defendants "may require that various types of [their franchisees'] marketing or advertising utilize a specific template or format."[9]

41.    Defendants' Franchise Disclosure Document is neither optional nor permissive, as they have taken legal action against franchisees "for failure to comply with the System advertising and marketing requirements . . . ."[10]

---

[7] *Id.* at 16 (emphasis added).

[8] *Id.*

[9] *Id.*

[10] *Id.* at 7.

42.     Defendants designate approved suppliers and vendors for their franchisees' marketing activities.[11]

43.     One of Defendants' approved suppliers is dotFIT.  Defendant Crunch Holdings, LLC's chief executive officer and Defendant Crunch Franchising's Manager James Rowley has an indirect ownership interest in this company. Additionally, Defendant Crunch Franchising, LLC's Executive Vice President of Operations, Craig Pepin-Donat, has an equity interest in dotFIT.[12]

44.     Defendants have also contracted with the vendor VFPNext to design a "Crunch Digital Toolkit," which is promoted as "one of the most advanced fully integrated sales systems ever created in the fitness industry."[13]

45.     Defendants require that franchisees contract with VFPNext in order to utilize the Crunch Digital Toolkit.

46.     The Crunch Digital Toolkit features "API connections" and "integration" with numerous marketing services, including telemarketing services.[14]

---

[11] *Id.*

[12] *Id.* at 8.

[13] Crunch Fitness – VFP, VFPNEXT, https://vfp.us/crunch-fitness/ (last visited Sept. 11, 2024).

[14] *Id.*

47.    Defendants require franchisees to pay into a Brand Marketing Fund. Those payments are currently set at 2% of monthly gross sales.[15]

48.    Defendants require franchisees to spend "the higher of a set amount and 7% of Gross sales for that month" on advertising.[16]

49.    Defendants require new franchise locations to spend a minimum of $30,000 to $70,000 on "Initial Advertising," which is "[p]aid directly to marketing company."[17]

50.    Defendants prohibit franchisees from maintaining their own website or registering any domain name/URL address.[18]

51.    Defendants maintain a standardized Franchise Agreement that they have entered into with, and which governs their relationships with, all Crunch franchisees nationwide.

52.    The Franchise Agreement specifically requires that each franchisee comply with Defendants' "grand opening plan." That plan requires each new Crunch

---

[15] *See* Crunch Franchise Doc., *supra* note 5, at 9, 17.

[16]    *Id.* at 16; *see also* Franchise FAQ, CRUNCH FITNESS, https://www.crunch.com/franchise/faq (last visited Sept. 9, 2024) ("we require you to spend a minimum of $15,000 in monthly local advertising for their first year of operation, and the higher of $10,000/month or 7% of gross sales in subsequent years of operation.").

[17] *See* Crunch Franchise Doc., *supra* note 5, at 4.

[18] *Id.*

health club location to conduct specific types of marketing and offer certain promotional discounts to potential customers, without deviation "from that plan without our prior written approval."[19]

53.    The "Founding Member" program is one example of the promotional discounts required as a part of Defendants' "grand opening plan" for new franchisees.  These programs offer a discounted rate to a certain number of people who are the first to sign up for memberships at the new location.

54.    Defendants design and implement marketing campaigns, all subject to the same requirements, to promote these "Founding Member" promotions at each new health club location.

55.    The "Founding Member" promotional marketing campaigns designed by Defendants all direct prospective customers to a website that Defendants collectively developed, operate, and maintain, and that Defendant Crunch, LLC hosts at www.crunch.com, where visitors input, and Defendants collect, the names, contact information (including telephone numbers), and the locations of interested individuals on a web-based intake form.

---

[19] *See* Crunch Franchise Doc., *supra* note 5.  On information and belief, Defendant Crunch LLC uses the same or a substantially similar franchise agreement.

56.    Defendants require all new Crunch health club locations to use the intake form hosted on www.crunch.com during their "Founding Member" promotional campaigns.

57.    The "Founding Member" promotion intake form hosted on www.crunch.com is common to all new Crunch locations running the campaign, regardless of whether they are franchised or corporate-run locations.

58.    The intake form displays a drop-down list with the locations of all Crunch locations running the "Founding Member" promotional campaign at that time:[20]

---

[20] Founder's Rate, CRUNCH LLC, https://info.crunch.com/founders-rate (last visited Sept. 11, 2024).



59.     After collecting prospective customers' names and contact information through the www.crunch.com website, Defendants orchestrate, oversee, and control advertising activities directed towards these individuals, including through coordinated telemarketing campaigns that involve, *inter alia*, the making of

telephone calls containing prerecorded voices advertising and marketing products and services to the telephone numbers provided by these individuals on the Founders Day intake form(s) on www.crunch.com.

60.    Defendants' Franchise Agreement further states that franchisees "must use a marketing Supplier that we designate and/or approve."[21]

61.    Defendants' Franchise Agreement also requires that franchisees "agree that all your advertising and marketing with respect to your Franchised Business in any medium, including in social media and mobile marketing, must be conducted in a dignified manner and must conform to the System."[22]

62.    Defendants' Franchise Agreement goes on to say: "We direct all marketing programs financed by the Brand Marketing Fund and have sole discretion over the creative concepts, materials and endorsements used and the geographic, market and media placement and allocation of the marketing programs."[23]

63.    Defendants' Franchise Agreement also states: "We may require various types of marketing or advertising utilize a specific template or format."[24]

---

[21] *See* Crunch Franchise Doc., *supra* note 5.

[22] *Id.*

[23] *Id.*

[24] *Id.*

64.    On or about October 6, 2023, pursuant to Defendants' standardized marketing program described above, Defendants made at least one unsolicited, prerecorded robocall to Plaintiff Pania's 7115 Number and at least one unsolicited, prerecorded robocall to Plaintiff Al-Nurridin's 7336 Number. Each of these calls delivered the following message to the recipient in a prerecorded voice:

> It's Crunch time! Our Plano location is having their one day only cyber sale starting 12:01 a.m. October 7th. Only the first 500 members will receive our founders rate and free Crunch flag. Sign up at CrunchPlano.com and don't forget to tell your friends.

65.    Upon listening to the messages, it was readily apparent to each of the Plaintiffs that the message they each received had been communicated via a prerecorded voice and not a live person's voice.

66.    Defendants made these prerecorded robocalls to Plaintiff Pania's 7115 Number and to Plaintiff Al-Nurridin's 7336 Number from the telephone number 214-910-1660 (the "1660 Number").

67.    During the limitation period applicable to this action, each of the members of the Class likewise received a prerecorded voice call substantially similar to the prerecorded voice calls received by Plaintiffs, and all such calls to the telephone numbers of the members of the Class were made by Defendants using the same technology or a technology substantially similar to the technology used by Defendants to make the prerecorded voice calls to Plaintiffs.

68.    Defendants made each of these calls for the purpose of promoting and advertising the sale of memberships for a Crunch fitness location.

69.    Plaintiffs are informed and believe, and thereupon allege, that each of their phone numbers, and each of the phone numbers to which Defendant made prerecorded voice calls to each of the members of Class, is maintained in the Crunch Digital Toolkit designed by VFPNext that Defendants require each of their franchisees to use.

70.    Defendants used the Crunch Digital Toolkit to compile a list of recipients for pre-recorded telemarketing calls, and Plaintiffs are informed and believe, and thereupon allege, that this list included Plaintiff Pania's 7115 Number and Plaintiff Al-Nurridin's 7336 Number, as well as the telephone numbers of the members of the Class, and that Defendants then uploaded the list to a telemarketing vendor (selected by Defendants) called CallFire.

71.    CallFire is one of the marketing "Supplier[s]" approved by Defendants under the terms of Defendants' Franchise Agreement.

72.    CallFire operates a web-based platform that automatically dials phone numbers to make telemarketing calls on behalf of its clients.

73.    CallFire maintains records of calls made through its system.

74.    Defendants contracted with CallFire, or directed a franchisee to contract with CallFire, to place the prerecorded telemarketing calls received by Plaintiff Pania and Plaintiff Al-Nurridin.

75.    Defendants contracted with CallFire and with similar vendors, or directed franchisees to contract with Call Fire and similar vendors, to place prerecorded telemarketing calls to each of the putative class members.

76.    Defendants maintain records of the calls placed to Plaintiff Pania, Plaintiff Al-Nurridin, and each of the putative class members.

77.    There have been dozens of online complaints from other consumers who have received unsolicited robocalls that originated from the 1660 Number,[25] as well as from other telephone numbers used by or on behalf of Defendants to make the same or substantially similar prerecorded voice calls to Plaintiffs and/or other the members of the Class marketing or promoting Defendants' products or services.

78.    The singular purpose of Defendants' prerecorded voice calls to Plaintiff Pania's 7115 Number and to Plaintiff Al-Nurridin's 7336 Number, as well as to the telephone numbers of putative Class members, was to market, advertise, promote, and solicit the sale of consumer goods and/or services.  Specifically, the purpose of the calls was to encourage or invite Plaintiffs and putative Class members to

---

[25] *See, e.g.*, Robokiller, available at https://lookup.robokiller.com/p/214-910-1660 (last accessed August 19, 2024).

purchase memberships at Crunch locations and to advertise the commercial availability of such memberships.

79.    Defendants maintain and have ready access to, either directly or through a third-party agent acting on their behalf (including without limitation CallFire), outbound transmission log files for all robocalls it has made to cellular telephone numbers to advertise and promote their services and goods, including memberships at Crunch locations.  These log files show, *inter alia*, the dates, times, target telephone numbers and content of each message sent to Plaintiffs and the putative class members.

80.    Neither of the Plaintiffs nor any members of the Class provided Defendants "prior express written consent" authorizing Defendants to make calls that contained prerecorded voices selling or marketing products or services to their cellular telephone numbers.

81.    Defendants' telephonic sales calls distracted, aggravated, and annoyed the Plaintiffs and putative Class members, including by intruding upon their seclusion and invading their privacy.

82.    At all times relevant to this action, Defendants have operated, maintained, overseen, and controlled all aspects of, and have funded and reaped enormous financial benefits from, the telemarketing campaigns described herein that were aimed at promoting, marketing, selling and soliciting the same of memberships

to various Crunch locations nationwide, including the unsolicited prerecorded voice calls placed to Plaintiffs' and the putative Class members' telephone numbers.

## **CLASS ALLEGATIONS**

83.    Plaintiffs bring this civil class action on behalf of themselves individually, and in a representative capacity on behalf of all other similarly situated persons, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

84.    Plaintiffs seek to represent the following Class:

> All persons within the United States who, within the four years prior to the filing of this lawsuit through the date of class certification, received, at a telephone number assigned cellular telephone service, one or more telephone calls containing a message in a prerecorded voice that advertised or marketed a membership to a Crunch fitness location.

85.    The following entities are excluded from the Class: Defendants, their officers and directors, members of its immediate families and its legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.[26]

86.    **Numerosity**: Members of the Class are so numerous that their joinder is impracticable. The exact number of the members of the Class is unknown to Plaintiffs at this time but is estimated to number in at least the tens of thousands.

---

[26] Plaintiffs reserve the right to revise or narrow the Class definition or to add one or more classes or subclasses as appropriate following a reasonable opportunity for discovery.

The exact number of Class members is capable of determination through discovery of the records in Defendants and their agents' possession, custody, and control. The disposition of the claims of all members of the Class in a class action will provide substantial benefits to the parties and the Court.

87.    **Commonality**: There are questions of law and fact common to Plaintiffs and to the proposed Class, including but not limited to the following:

a.  Whether Defendants initiated prerecorded telephonic marketing and sales calls to Plaintiffs and the Class members;

b.  whether Defendants made calls to Plaintiffs and Class members without first obtaining prior express written consent to make the calls;

c.  whether Defendants' conduct constitutes a violation of the TCPA;

d.  whether Class members are entitled to treble damages based on the willfulness of Defendants' conduct.

88.    **Typicality**: Plaintiffs' claims are typical of the claims of Class members in that the named Plaintiffs, like all Class members, received one or more prerecorded voice call from Defendants advertising or marketing the availability of Crunch memberships. Plaintiffs' claims, and the claims of the Class members, arise from a uniform practice and course of conduct by Defendants.  Plaintiffs and Class members were also harmed by the acts of Defendants in a uniform fashion, in that Plaintiffs and Class members had their privacy invaded and their seclusion intruded upon by Defendants' distracting, aggravating, and annoying prerecorded voice calls

placed to their cellular telephones. Accordingly, Plaintiffs' claims and the injuries they suffered are typical of the Claims and injuries of unnamed Class members.

89. **<u>Predominance</u>**: The questions of law and fact common to Class members predominate over questions that may affect individual members of the Class. The elements of the legal claims brought by Plaintiffs and Class members are capable of being proven at trial with common, class-wide proof.

90. **<u>Adequacy</u>**: Plaintiffs are qualified to and will fairly and adequately protect the interests of Class members. Plaintiffs' interests in this matter are not directly or irrevocably antagonistic to the interests of Class members, and they will vigorously pursue the claims of the members of the class. Plaintiffs have retained counsel experienced and competent in class action litigation. Plaintiffs' attorneys, proposed class counsel, are well-versed in the rules governing class action discovery, certification and settlement. In addition, the proposed class counsel is experienced in litigating consumer class actions including class actions alleging violation of the TCPA. Plaintiffs' counsel will fairly and adequately protect and otherwise represent the interests of unnamed members of the Class.

91. **<u>Superiority</u>**: A class action is superior to all other available methods for the fair and efficient adjudication of this matter because:

- If brought and prosecuted individually, Class members' claims would require proof of the same material and substantive facts.

- The pursuit of separate actions by individual members of the Class would, as a practical matter, be dispositive of the interests of other members of the Class and could substantially impair or impede their ability to protect their interests.

- The pursuit of separate actions by individual members of the Class could create a risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for Defendants.

- These varying adjudications and incompatible standards of conduct, in connection with the presentation of the same essential facts, proof and legal theories, could also create and allow the existence of inconsistent and incompatible rights within the Class.

- The damages suffered by each individual member of the Class may be relatively modest. Thus, the expense and burden of litigating each of their claims individually makes it difficult for the members of the Class to redress the wrongs done to them.

- Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would, therefore, have no effective remedy at law.

- The pursuit of Plaintiffs' claims, and the claims of the members of the Class, in one forum will achieve efficiency and promote judicial economy.

- There will be little difficulty in the management of this action as a class action.

92.    Defendants have acted or refused to act on grounds generally applicable to the members of the Class, making final declaratory or injunctive relief appropriate.

93.     Plaintiffs and the Class members have all suffered and will continue to suffer harm and damages because of Defendants' unlawful conduct.

<strong><u>CLAIM FOR RELIEF</u></strong><br><strong>Violation of 47 U.S.C. § 227(b)(1)(A)(iii)</strong><br><strong>(By Plaintiffs, Individually and on Behalf of the Class)</strong>

94.     Plaintiffs incorporate by reference the foregoing paragraphs of this First Amended Class Action Complaint as if fully stated herein.

95.     It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any . . . artificial or prerecorded voice to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii).

96.     The regulations governing the TCPA promulgated by the FCC provide that callers may not "initiate any telephone call . . . using an . . . artificial or prerecorded voice to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." 47 C.F.R. § 64.1200(a)(1)(iii).

97.     Additionally, the regulations governing the TCPA promulgated by the FCC provide that callers may not "[i]nitiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, . . . artificial or prerecorded voice . . . other than a call made with the prior express

written consent of the called party or the prior express consent of the called party when the call is made[.]" 47 C.F.R. § 64.1200(a)(2).

98.    As alleged herein, Defendants made telephone calls using prerecorded voices to the cellular telephone lines of Plaintiffs and Class members, for the purpose of marketing and advertising their services and goods.

99.    Defendants made such telephone calls without having first obtained the express written consent of Plaintiffs or members of the Class authorizing Defendants to make telephone calls containing prerecorded voices to their cellular telephone lines.

100.    Accordingly, by making telephone calls containing prerecorded voices to the cellular telephone lines of Plaintiffs and the other members of the putative Class, for the purpose of advertising and marketing their goods and services, Defendants violated § 227(b)(1)(A)(iii) and § 64.1200(a)(1)(iii) and (a)(2).

101.    Defendants' violations of the TCPA, as complained of herein, were committed by Defendants willfully or knowingly.  Plaintiffs are informed and believe, and thereupon allege, that Defendants were aware of the provisions of the TCPA (and the FCC's implementing regulations governing the TCPA) that are at issue in this action prior to making the telephone calls containing prerecorded voices to Plaintiffs' and Class members' cellular telephone lines in violation of the TCPA. Additionally, prior to making the telephone calls that are the subject of this action,

Defendants were aware that it lacked the prior express written consent of any of the Plaintiffs or Class members authorizing it to make telephone calls containing prerecorded voices to their cellular telephone lines. Furthermore, prior to making the telephone calls that are the subject of this action, Defendants have been a defendant in multiple prior actions alleging violation of the TCPA, making it keenly aware of the TCPA's prohibitions and its requirements for obtaining the requisite consent prior to making prerecorded voice call advertisements to consumers' cellular telephones.

102.   As a result of Defendants' conduct and pursuant to § 227(b) of the TCPA, Plaintiffs seek, on behalf of themselves and members of the Class, an injunction prohibiting Defendants from making TCPA-violative calls to their cellular telephone lines in the future, as well as $500.00 for each of Defendants' violations of the TCPA as alleged herein (or $1,500 for each such violation committed willfully or knowingly).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the putative Class, pray for the following relief:

a) An order certifying this case as a class action on behalf of the Class as defined above, and appointing Plaintiffs as the representatives of the Class and Plaintiffs' attorneys as counsel to represent the Class;

b) An award of the statutorily set of $500.00 in damages for each of Defendants' violations of the TCPA as alleged herein (or $1,500 for each such violation committed willfully or knowingly);

c) An order declaring that Defendants' actions, as set out above, violate the TCPA; and

d) An injunction prohibiting Defendants from making prerecorded voice calls to Plaintiffs' and Class members' cellular telephone lines in the future, absent the recipient's prior express written consent.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: September 30, 2024             Respectfully submitted,

                                      /s/ Elliot O. Jackson
                                      Elliot O. Jackson
                                      NY Attorney Reg. No. 6076798
                                      HEDIN LLP
                                      1395 Brickell Ave., Suite 610
                                      Miami, Florida 33131-3302
                                      Telephone:(305) 357-2107
                                      Facsimile: (305) 200-8801
                                      ejackson@hedinllp.com

                                      Tyler K. Somes
                                      District of Columbia Bar No. 90013925
                                      HEDIN LLP
                                      1100 15th Street NW, Ste 04-108
                                      Washington, D.C. 20005
                                      Telephone: (202) 900-3332
                                      Facsimile: (305) 200-8801
                                      tsomes@hedinllp.com

Matthew J. Langley
NY Attorney Reg. No. 4831749
ALMEIDA LAW GROUP LLC
849 W. Webster Avenue
Chicago, Illinois 60614
Telephone: (312) 576-3024
matt@almeidalawgroup.com

*Counsel for Plaintiffs and Putative Class*